IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

IN RE: ADVANCED TISSUE, LLC            Case No. 4:21-bk-12261J
                                                                                       (Chapter 11)

             **Debtor-in-Possession.**

## MEMORANDUM OPINION AND ORDER

Before the Court is the *United States' Motion for Determination Automatic Stay Does Not Apply or, in the Alternative, for Relief from the Automatic Stay to Set Off Mutual Debts* (the "**Motion**") (Doc. No. 189) filed by the United States of America, on behalf of the Department of Health and Human Services, acting through its designated component, the Centers for Medicare & Medicaid Services ("**CMS**"), on August 25, 2022. Advanced Tissue, LLC (the "**Debtor**") filed a response to the Motion on September 14, 2022 (Doc. No. 195). The Motion and response were heard on October 11, 2022.[1] CMS appeared through its counsel, Augustus T. Curtis with the United States Department of Justice, and Stacey E. McCord, Assistant U.S. Attorney. The Debtor appeared by and through its counsel, Kevin P. Keech of the Keech Law Firm, PA. At the close of the hearing, the Court took the matter under advisement.

In the Motion, CMS asserts the Debtor received over $23 million in Medicare overpayments, and that CMS is entitled to recoup a portion of the overpayments against approximately $1.2 million in Medicare reimbursements that CMS is holding in a "*Strumpf* freeze."[2] Alternatively, CMS argues it is entitled to exercise its right of setoff against these frozen funds. For the reasons stated below, the Court finds CMS is entitled to recoup a portion

---

[1] CMS expressly waived the thirty-day hearing requirement of 11 U.S.C. § 362(e)(1) in the Motion.
[2] Out of an abundance of caution, the funds were frozen in accordance with the United States Supreme Court's decision in *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995).

of the overpayments against the frozen funds, and the automatic stay does not prevent CMS from doing so.

## I. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. *See also Fischbach v. Ctrs. for Medicare & Medicaid Servs. (In re Fischbach)*, No. 12-cv-00513, 2013 WL 1194850, at *2 (D.S.C. Mar. 22, 2013). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), and (O). The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to this contested matter by Federal Rules of Bankruptcy Procedure 4001 and 9014.

## II. Background Facts

The facts before the Court are not in dispute.[3] Prior to filing bankruptcy, from 2001 to June 18, 2021, the Debtor was enrolled as a Medicare Part B supplier. In its Medicare enrollment application, the Debtor's representative agreed to abide by all Medicare laws and regulations and then made the following certification: "I agree that any existing or future overpayment to me by the Medicare or other federal health care program(s) may be recouped by Medicare or other federal health care program(s) through withholding future payments." (CMS Ex. A, at 11).

On May 7, 2021, CMS notified the Debtor it was suspending Medicare reimbursements to the Debtor while it investigated "credible allegations of fraud." (CMS Ex. B, at 1). Specifically, the suspension was based on information indicating the Debtor had misrepresented services billed to Medicare. As explained in the suspension letter, documentation submitted to Medicare did not support the type of supplies billed. The Debtor attempted to rebut the

---

[3] At the hearing, the parties presented their cases on stipulated facts and exhibits.

suspension, but CMS determined the suspension should remain in place pending its investigation. On or about June 18, 2021, the Debtor disenrolled from the Medicare program and ceased business operations. After disenrolling, the Debtor was not entitled to, and did not, bill Medicare for further goods or services.

On August 23, 2021, the Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code. Both prior and subsequent to the bankruptcy filing, CMS Unified Program Integrity Contractors ("**UPICs**") requested documents supporting the Debtor's right to payment of claims identified in their investigations. Claims previously paid were reopened during the investigations. Some of the claims identified by the UPICs dated as far back as 2016. The Debtor provided some documentation in support of its claims in August and September 2021. The Debtor did not, however, provide documentation responsive to all the requests because it did not have sufficient staff to respond.

In May 2022, the UPICs issued notices of their overpayment determinations, finding the Debtor had been overpaid $23,669,190.64 from 2016 through 2021. Many of these overpayment determinations resulted from the Debtor's failure to provide documentation in support of its claims. For example, one of the UPICs investigated claims submitted by the Debtor with dates of service from November 1, 2017, through August 30, 2021. It randomly selected thirty-five claims as a sample and requested medical records from the Debtor for these sample claims. The Debtor did not provide any medical records, which resulted in a 100% denial rate. This percentage was then extrapolated to all claims submitted by the Debtor in the particular region during the November 2017 through August 2021 timeframe, resulting in an overpayment determination of $3,408,679.01.[4] (CMS Ex. H, at 24–34).

---

[4] This methodology is in accordance with the Medicare statutes and regulations. *See* 42 U.S.C. § 1395ddd.

In addition, even in instances where the Debtor did respond with medical records, many of its claims were similarly determined to be overpayments based on the records provided. For example, one of the UPICs investigated claims submitted by the Debtor with dates of service from March 31, 2016, through February 22, 2019. During the investigation, the Debtor submitted medical records in support of the claims, but a determination was nevertheless made that the Debtor had been overpaid by $255,216.02 during this timeframe. (CMS Ex. H, at 16–19).

Again, the overpayment determinations made by the various UPICs totaled $23,669,190.64. There is no evidence in the record of an administrative appeal by the Debtor of any of the overpayment determinations.[5] On May 20, 2022, when the overpayment determinations had been made, CMS lifted the regulatory suspension on the Medicare reimbursements it was holding and instead placed the funds into an administrative "*Strumpf* freeze." At the time of the hearing, CMS was holding $1,220,224.27 in prepetition Medicare reimbursements claimed by the Debtor.

### III. Arguments

CMS argues it is entitled to recoup a portion of its overpayments to the Debtor against the administratively frozen funds because the two claims arise out of the same transaction. Alternatively, it argues it should be allowed to exercise its right of setoff against the frozen funds, and it seeks relief from stay to do so. The Debtor argues that neither recoupment nor setoff is appropriate. As to recoupment, it argues the payments involved do not constitute a single integrated transaction, and in addition, that the equities of the case do not support

---

[5] On October 11, 2022, the same day as the hearing on the Motion in this case, the Court also held a hearing on a motion to dismiss filed in a related adversary proceeding: *Advanced Tissue, LLC v. U.S. Centers for Medicare and Medicaid Services*, AP No. 4:22-ap-01026 (Bankr. E.D. Ark.). Counsel for the Debtor indicated at that hearing that the Debtor had no intention of appealing the overpayment determinations.

4

recoupment. As to setoff, it argues setoff is improper because CMS has not filed a proof of claim in the bankruptcy case.

### IV. Discussion

**A. Recoupment and Setoff – Generally**

The doctrines of recoupment and setoff are similar but distinct. Under the doctrine of recoupment, a defendant may "deduct its claim from the amount the plaintiff could otherwise recover *if* the claim arises out of the same transaction or subject matter on which the plaintiff sued." *Terry v. Standard Ins. Co. (In re Terry)*, 687 F.3d 961, 963 (8th Cir. 2012) (citing *Bird v. Carl's Grocery Co. (In re NWFX, Inc.)*, 864 F.2d 593 (8th Cir. 1989)). Recoupment does not appear in the Bankruptcy Code but "is still important in bankruptcy." *In re NWFX, Inc.*, 864 F.2d at 596. It is "an equitable principle that allows a creditor in bankruptcy 'to show that because of matters arising out of the transaction sued on, he or she is not liable in full for the [debtor's] claim.'" *United States v. Dewey Freight Sys., Inc.*, 31 F.3d 620, 622–23 (8th Cir. 1994) (alteration in original) (quoting COLLIER ON BANKRUPTCY ¶ 553.03 (Lawrence P. King ed., 15th ed.)). "For recoupment to apply . . . the creditor must have a claim against the debtor that arises from the same transaction as the debtor's claim against the creditor." *In re NWFX, Inc.*, 864 F.2d at 597 (citing *Ashland Petroleum Co. v. Appel (In re B & L Oil Co.)*, 782 F.2d 155, 157 (10th Cir. 1986)).

In the Eighth Circuit, "[t]o justify recoupment in bankruptcy, 'both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations.'" *Dewey Freight*, 31 F.3d at 623 (quoting *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1081 (3d Cir.

5

1992)). The focus of the analysis is whether the claims arise out of the same *transaction*, not whether they arise out of the same *contract*. *Id.*

The Eighth Circuit has further explained that while "[f]airness and equity may influence whether two competing claims arise from the same transaction . . . a court should not impose an additional 'balancing of the equities' requirement once a party meets the same-transaction test." *In re Terry*, 687 F.3d at 965. It agreed with the First Circuit that in most cases, "analysis of the recoupment issue should both begin and end with the same transaction question without discussing other equitable issues." *Id.* at 964 (quoting *Slater Health Ctr., Inc. v. United States (In re Slater Health Ctr., Inc.)*, 398 F.3d 98, 104 (1st Cir. 2005)).

Setoff, while similar to recoupment, has distinct elements not required for recoupment. Generally, the doctrine of setoff provides that parties "that owe each other money . . . [may] apply their mutual debts against each other." *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995). The Bankruptcy Code does not create a federal right of setoff, but Section 553 of the Bankruptcy Code preserves a creditor's setoff rights "so long as the setoff meets the additional requirements of [Section] 553(a)." *Sarachek v. Luana Sav. Bank (In re Agriprocessors, Inc.)*, 547 B.R. 292, 325 (N.D. Iowa 2016). Setoff is proper under Section 553 if three elements are met: (1) the creditor owed a debt to the debtor that arose prepetition; (2) the debtor owed a debt to the creditor that arose prepetition; and (3) the debts are mutual. *Id.* (first citing 11 U.S.C. § 553(a)(2); and then citing *United States v. Gerth*, 991 F.2d 1428, 1431 (8th Cir. 1993)). The prepetition and mutuality requirements for setoff are not requirements for recoupment. COLLIER ON BANKRUPTCY ¶ 553.10 (Richard Levin & Henry J. Sommer eds., 16th ed.).

In addition, the automatic stay does not bar a creditor from exercising its right of recoupment because "recoupment is in the nature of a right to reduce the amount of a claim." *Id*.

6

In other words, "recoupment applies to define the obligation in question, rather than establish or enforce a separate debt." *Id.*; *see also Pruett v. Am. Income Life Ins. Co. (In re Pruett)*, 220 B.R. 625, 628 (Bankr. E.D. Ark. 1997). Conversely, the automatic stay does prevent creditors from exercising their right of setoff. *Strumpf*, 516 U.S. at 19; *In re Pruett*, 220 B.R. at 628.

### B. The Medicare Program

A general understanding of the Medicare program is helpful to the Court's analysis of whether recoupment or setoff applies to the issue at hand. The Medicare program was formed by Congress "to pay for the medical care of the aged and disabled." *Josephine C. Bello, M.D., PLC v. Azar (In re Josephine C. Bello, M.D., PLC)*, 596 B.R. 41, 45 (Bankr. E.D. Mich. 2018) (citing 42 U.S.C. § 1395 *et seq.*). Generally, Part A[6] establishes hospital insurance programs and Part B[7] is a voluntary supplementary medical insurance program. *Id*.

A Medicare Part B supplier, such as the Debtor, may bill Medicare directly and receive payment directly from Medicare (or its affiliates), rather than from the patient. *Id*. (citing 42 U.S.C. § 1395u(b)(3)(B)(ii), (b)(6), (h)). Payment is made promptly, usually within thirty days. 42 U.S.C. § 1395u(c). Importantly, however, "[u]pfront payment through Part B does not necessarily mean the matter is concluded because a Medicare claim remains potentially subject to post-payment review and recoupment of Medicare payments, in whole or in part." *In re Josephine C. Bello, M.D., PLC*, 596 B.R. at 45. The payments are subject to "reviews and audits for the purpose[] of ensuring the integrity of the Medicare program." *Id*. (first citing 42 U.S.C. § 1395ddd; and then citing 42 C.F.R. Subchapter B, Part 420). Claims, including claims paid several years prior to the review, may be reopened upon the happening of certain events such as

---

[6] 42 U.S.C. §§ 1395c–1395i-6.
[7] 42 U.S.C. §§ 1395j–1395w-6.

the receipt of "reliable evidence . . . that the initial determination was procured by fraud." 42 C.F.R. § 405.980 (2023).

In addition, Medicare payments may be suspended when, among other things, credible allegations of fraud exist.[8] 42 C.F.R. § 405.371(a)(2) (2023). The regulations further provide that "Medicare payments to providers and suppliers . . . may be . . . recouped, in whole or in part, by a Medicare contractor if the Medicare contractor or CMS has determined that the provider or supplier to whom payments are to be made has been overpaid." 42 C.F.R. § 405.371(a)(3) (2023). The suspended payments "are first applied to reduce or eliminate any overpayments determined by the Medicare contractor, or CMS." 42 C.F.R. § 405.372(e) (2023). The overpayment determinations may be appealed through an administrative appeal process set out in the Medicare statutes and regulations. Generally though, "the recoupment . . . goes into effect automatically." 42 C.F.R. § 405.373(d) (2023).

### C. Recoupment of Medicare Overpayments

The Eighth Circuit has not decided whether reimbursements and collection of overpayments under the Medicare statutes, and in particular the statutes and regulations governing Part B suppliers like the Debtor, constitute a single integrated transaction for purposes of recoupment.

A majority of courts that have considered the issue have determined the stream of payments and adjustments under Part A of the Medicare program constitutes a single integrated transaction. *See, e.g.*, *Holyoke Nursing Home, Inc. v. Health Care Fin. Admin. (In re Holyoke Nursing Home, Inc.)*, 372 F.3d 1, 4 (1st Cir. 2004) ("Both the Medicare statute and the provider

---

[8] Under the Medicare regulations, a credible allegation of fraud is defined as "an allegation from any source, including but not limited to the following: (1) Fraud hotline tips verified by further evidence. (2) Claims data mining. (3) Patterns identified through provider audits, civil false claims cases, and law enforcement investigations. Allegations are considered to be credible when they have indicia of reliability." 42 C.F.R. § 405.370(a) (2023).

agreement—by contemplating HCFA's payment of estimated costs, corrective audits, and retroactive adjustments or partial adjustments for overpayments and underpayments in determining HCFA's net liability for current cost-year services—strongly indicate that the contractual relationship between HCFA and Holyoke constitutes one, ongoing, integrated transaction."); *United States v. Consumer Health Servs. of Am., Inc.*, 108 F.3d 390, 395 (D.C. Cir. 1997) ("Congress rather clearly indicated that it wanted a provider's stream of services to be considered one transaction for purposes of any claim the government would have against the provider."); *But cf. In re Univ. Med. Ctr.*, 973 F.2d 1065 (limiting single integrated transaction to those made within the cost-year unique to Part A).

While the payment systems under Part A and Part B have some differences, payments to Medicare Part B suppliers are subject to subsequent review and adjustment for overpayments, as are payments to Part A participants. *See In re Fischbach*, 2013 WL 1194850, at *5 (The procedurally different methods of submitting and collecting initial payments are "not relevant to the issue of reimbursement for over and underpayments [because] the statutory scheme assumes that readjustments for overpayments and underpayments will be necessary for both categories of Medicare providers." (citing *Barth v. Blue Cross & Blue Shield of S.C.*, 434 F. Supp. 755, 756 (D.S.C. 1977))).

### D. Recoupment in This Case

Here, the Debtor was enrolled as a Medicare Part B supplier for approximately twenty years. In its enrollment application, the Debtor's representative specifically agreed that any overpayments may be recouped by Medicare through withholding future payments. The Eighth Circuit has explained that "in most cases where recoupment has been allowed, the parties were

9

operating under a contract which specifically allowed recoupment." *In re NWFX, Inc.*, 864 F.2d at 597 (citing *B & L Oil Co.*, 782 F.2d at 157).

In its enrollment application, the Debtor's representative also agreed to abide by all Medicare laws and regulations. In accordance with these Medicare laws and regulations, the Debtor received payments directly from Medicare for years. In May 2021, however, payments to the Debtor were suspended because of credible allegations of fraud. Claims previously paid to the Debtor were reopened and additional documentation was requested. Although some documentation was provided, a substantial amount was not, and the UPICs ultimately determined the Debtor had been overpaid by $23,669,190.64. Under the plain language of the Medicare regulations, overpayments may be recouped from suspended funds. *See* 42 C.F.R §§ 405.371(a)(3), 405.372(e) (2023).

The structure of the Medicare payment system supports a finding of a single integrated transaction. Under the applicable statutes and regulations, suppliers are quickly reimbursed for claims, but the payments are subject to subsequent review and audit, which may take place years later depending on the reason for the review. Recoupment of any overpayment is woven into the very fabric of the Medicare payment system. This Court agrees with the court in *Fischbach* that given the system of payments and subsequent adjustments, it is rational to treat the claims as arising from a single integrated transaction. *See In re Fischbach*, 2013 WL 1194850, at *5 ("[T]he relationship between providers or suppliers and Medicare is built on a system of constantly balancing payments made and readjustments for over and underpayments such that it is rational to treat the interaction between the parties as a single, integrated transaction.").

In addition, the purpose behind the Medicare payment system, particularly the post-payment review and audit system, supports a finding of a single integrated transaction. This

review system was designed to promote the integrity of the Medicare program. *See, e.g.*, 42 U.S.C. § 1395ddd. Here, payments to the Debtor were suspended based on credible allegations of fraud. Previously paid claims were reopened and reviewed. During the review, the Debtor failed to provide sufficient documentation supporting its previously paid claims. These circumstances support a finding of a single integrated transaction between the parties such that the Debtor should not be allowed to enjoy the benefits of the transaction (i.e., payment) without also meeting its obligations (i.e., properly documenting claims and showing it was entitled to the payments previously received).

Accordingly, the Court finds CMS's overpayment claim against the Debtor arises from the same transaction as the Debtor's claim against CMS for the frozen reimbursements. Because the Court has found the claims arise out of a single integrated transaction, no further equitable analysis or balancing is required. *In re Terry*, 687 F.3d at 965.

CMS may recoup a portion of its $23,669,190.64 overpayment against the $1,220,224.27 in frozen funds. The automatic stay does not apply to CMS's exercise of its right of recoupment. In addition, because the Court has found the doctrine of recoupment applies, it will not address CMS's alternative argument regarding setoff.

## V. Conclusion

For the reasons stated herein, the Court finds the claims of CMS and the Debtor arise out of a single integrated transaction. Accordingly, CMS may recoup overpayments previously made to the Debtor against the $1,220,224.27 in Medicare reimbursements that CMS is holding in a "*Strumpf* freeze."

**IT IS SO ORDERED.**

Phyllis M. Jones
United States Bankruptcy Judge
Dated: 03/16/2023